Maureen THOMAS, Plaintiff–Appellant,

v.

Jo Anne BARNHART, Commissioner of the Social Security Administration,* Defendant–Appellee.

No. 99–35711.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 2001.

Filed Jan. 24, 2002.

---

* Jo Anne Barnhart is substituted for her predecessor as Commissioner of the Social Security Administration. Fed. R.App. P. 43(c)(2).

Tim Wilborn, Portland, OR, for the plaintiff-appellant.

Norman M. Barbosa, Assistant Regional Counsel for the Social Security Administration, Seattle, WA, for the defendant-appellee.

Before T.G. NELSON, GRABER, and RAWLINSON, Circuit Judges.

RAWLINSON, Circuit Judge.

Appellant Maureen Thomas appeals the district court's order affirming the Social Security Administration Commissioner's ("Commissioner's") decision denying Thomas' application for Supplemental Security Income benefits. We have jurisdiction pursuant to 28 U.S.C. § 1291. *See Tackett v. Apfel,* 180 F.3d 1094, 1097 (9th Cir.1999). Because substantial evidence supports the Commissioner's decision to deny Appellant benefits, we affirm.

*BACKGROUND*

Ms. Thomas applied for Supplemental Security Income benefits on December 7, 1993, with a protective filing date of August 11, 1993, alleging disability since August 11, 1993. She has not been gainfully employed since 1993. Ms. Thomas' applications were denied initially and upon reconsideration. A hearing was held before an administrative law judge ("ALJ") on December 14, 1995.

At the hearing, Ms. Thomas alleged disability due to back, shoulder and neck pain; carpal tunnel syndrome; difficulty concentrating; weakness and fatigue; depression; and disturbed sleep. At the time of the hearing, Ms. Thomas was 52 years old, had completed high school and had earned associate's degrees in art. Her past relevant work is as a bartender, house cleaner and concession worker.

In June of 1992, Ms. Thomas was seen by a chiropractor, Dr. B.G. Davis, for complaints of pain in her right leg and lower back, after she abruptly stepped off a floor ladder.

On July 13, 1992, Ms. Thomas was seen by an orthopedic surgeon, Mark Lau, M.D. Ms. Thomas described right hip pain caused by jumping three to four feet off a ladder while changing a light bulb.

Between November 3, 1992, and November 17, 1993, Ms. Thomas was seen by Mark Silver, M.D. Initially, she complained of left side abdominal pain.

In June 1993, while on vacation in California, Ms. Thomas cut her foot on a shower drain and struck her left shoulder on the faucet when she jumped back. She was seen by an emergency room physician, Tuan Luu, M.D., for complaints of pain in the left shoulder and back area. Dr. Luu diagnosed acute contusion of the left shoulder area and puncture wound of the left foot.

That same month, Dr. Silver examined Ms. Thomas and recorded mild discomfort in her neck, with little or no spasm; mild tenderness in the trapezius muscle distribution and the lumbar paraspinal muscles; and full range of motion in her shoulders.

In July 1993, Dr. Silver noted that after hydrotherapy, both upper and lower back were "much better, although she continues to have some pain."

In August 1993, Dr. Silver noted that Ms. Thomas was unable to tolerate Flexeril, and still had back pain. She continued to see the physical therapist three times a week, and Dr. Silver continued her prescription of Lodine. Dr. Silver noted that the cervicodorsal and lumbar sprains were "slowly improving."

In September 1993, Dr. Silver noted that Ms. Thomas reported that "[o]verall

she is doing better." Her back pain was improving, she was sleeping well on Doxepin, and the Soma was also helpful.

By November 1993, Dr. Silver found tenderness in Ms. Thomas back, but no spasm, and good range of motion.

Ms. Thomas was seen by Diane Conrad, a mental health nurse practitioner, in March 1994 for complaints of depression. Ms. Thomas reported alcohol and marijuana abuse, stating that she had last used marijuana two weeks earlier. Ms. Conrad concluded that in spite of chronic pain syndrome, depression and substance abuse, Ms. Thomas had the ability to perform work-related mental activity such as understanding, memory, concentration and social interaction, but found her adaptation and motivation "questionable."

James Wahl, Ph.D., performed a psychodiagnostic evaluation on Ms. Thomas in April 1994. She was interviewed and given a mental status examination. Ms. Thomas told Dr. Wahl she had drunk a six-pack a day from 1988 to several months previously, but denied a problem with alcohol. She said she had nothing to drink for about a month and, contradicting what she had told Ms. Conrad a month earlier, reported that she had not smoked marijuana for a year.

At her appointment with Dr. Mize in June 1994, Ms. Thomas walked with a cane and complained of knee pain. However, Dr. Mize found no crepitus or fluid, and opined that the knee was "stable."

In July 1994, Ms. Thomas saw Katherine Groves, M.D., for numbness in her hands and right knee pain. Examination revealed no significant swelling or deformity, intact ligaments, and no patellar apprehension sign. X-rays of the knee were normal. Ms. Thomas asked Dr. Groves for an opinion about whether she was disabled. Dr. Groves replied that if Ms.

Thomas were "on good anti-inflammatory medication she should be able to use her joints in such a way that she could work."

Ms. Thomas saw an orthopedist, Michael Coe, M.D., in August 1994, again complaining of right knee pain and chronic neck and back pain. Dr. Coe could detect no clinical basis for Ms. Thomas' complaints of knee pain, finding no physical or radiographic evidence of chronic patellar subluxation or dislocation.

On September 26, 1994, Ms. Thomas went to the hospital in tears complaining of chronic pain. Jeff Weintraub, P.A., reported that Ms. Thomas had not experienced any new trauma, but stress had made her pain worse.

In November 1994, Disability Determination Services psychologist Peter LeBray, Ph.D., reviewed Ms. Thomas' medical records and concluded that they suggested moderate limitations in the areas of understanding and remembering detailed instructions, carrying out detailed instructions, and maintaining extended attention and concentration. He also detected a moderate limitation in appropriate interaction with the public. He noted that Ms. Thomas was aware of normal hazards and could take appropriate precautions. Dr. LeBray's functional capacity assessment indicated that Ms. Thomas could understand, remember and carry out at least simple, low stress instructions with regular supervision, but should avoid hazardous settings and would need assistance with independent planning.

Ms. Thomas was seen by Larry Maukonen, M.D., a neurologist, in January 1995, for chronic neck pain, lower back pain and numbness and tingling in her hands. Examination showed normal coordination, no tremor, and that Ms. Thomas had the ability to stand on her toes and heels and perform a partial squat without difficulty.

Her gait was normal and her motor strength was normal and symmetrical in upper and lower extremities on individual muscle testing. Her neck had a marked decreased range of motion with complaints of pain on the right side of her neck.

In March 1995, Ms. Thomas was seen by Gregory Duncan, M.D., an orthopedic surgeon, for neck and right wrist pain. He diagnosed right carpal tunnel syndrome and neck pain radiating into the right arm.

On June 27, 1995, Dr. Silver noted that Ms. Thomas requested that he change insurance forms that he filled out a year and half earlier. Dr. Silver noted that Ms. Thomas challenged his earlier opinion and that she requested a change to indicate that she was completely disabled through January 1, 1994. Dr. Silver complied with Ms. Thomas' request by summarizing other evaluations of Ms. Thomas' condition and revising Ms. Thomas' forms to state that Ms. Thomas was totally disabled from June 1993, to January 1, 1994. Under the heading "OBJECTIVE," where his objective observations were normally noted, Dr. Silver wrote only "Deferred."

On July 21, 1995, Dr. Groves signed a "Physician's Certificate of Borrower's Total and Permanent Disability" to support discharge of Ms. Thomas' student loans. The form certified that since 1993, Ms. Thomas was "unable to engage in any substantial gainful activity because of a medically determinable impairment that is expected to continue for a long and indefinite period of time."

Ms. Thomas was given a one-hour physical capacity evaluation in April 1996. The examiner noted that for the endurance step test, which requires stepping on a 12–inch step at a rate of twenty-four steps per minute, Ms. Thomas would not attempt even one step. The grip strength and pinch strength tests reflected less than a valid effort. While the examiner noted that there was not a good correlation between the pain rating and observed behavior, he nevertheless indicated that the results of the test appeared to be valid. The examiner concluded that Ms. Thomas "would not be able to do any significant type of work."

A two-day physical capacity evaluation was conducted on January 23–24, 1997. The therapist observed that Ms. Thomas "self-limited herself during testing." The therapist recommended placement in a "very sedentary job," finding that Ms. Thomas could tolerate only up to two hours of work with frequent rest breaks.

Ms. Thomas testified at the hearing that she lived alone in a trailer and had driven herself to the hearing. She stated that as of the time of the hearing she wore back and knee braces, but rarely used the wrist splint prescribed for her carpal tunnel syndrome. She was taking Vicodin for pain, Oravil for inflammation, and Amitriptyline to help her sleep. She cooked simple meals for herself and spent most of the afternoon sitting in bed reading and most of the evening watching television. She did her own laundry, dishes and shopping. She denied any significant drinking for three or four months preceding the hearing. She could not walk for more than ten or fifteen minutes, was unable to stand for any period of time, could not reach above her head and could not lift more than five pounds.

Jonathan Warner, Ph.D., testified as an impartial medical expert. He rated her capacity for activities of daily living as slightly limited. He found moderate difficulties with maintaining social functioning and deficiencies of concentration, persistence, or pace occurring often. He found no marked mental disorders, and described moderate mental residual functional capacity limitations. The ALJ noted

that this assessment was essentially the same as that of Dr. LeBray, and adopted Dr. Warner's limitations in his findings.

The ALJ called a vocational expert ("VE"), Francene Gomez, to testify. On reexamination, he solicited the VE's opinion about a hypothetical claimant able to do less than the full range of light work, with lifting limited to twenty pounds occasionally, limited bending, a sit-stand option, and some limitations in the use of the right hand, caused by numbness. The VE testified that such a person could work as an office helper, surveillance system monitor, telephone quotation clerk, and a call-out operator.

On cross-examination by Ms. Thomas' representative, the VE testified that the jobs permitted alternating sitting, standing and walking, and were unskilled, requiring little ability to maintain sustained concentration. The VE further testified that if Ms. Thomas could only lift five pounds, she would not be able to perform the office helper work, but would be able to do the other jobs.

The ALJ found that while Ms. Thomas could not return to her former work, she had the residual functional capacity to perform the jobs identified by the VE. In assessing Ms. Thomas' residual functional capacity, the ALJ found Ms. Thomas' testimony about the intensity of her pain and other limitations not credible.

The ALJ's credibility finding was based on Ms. Thomas' work history, her daily activities, doctors' assessments, and Ms. Thomas' apparent exaggeration of pain and lack of effort in the two physical capacity evaluations.

On February 28, 1997, the ALJ issued a decision finding Ms. Thomas not disabled because she retained the residual functional capacity to perform a reduced range of light and sedentary work. The ALJ's rul-ing became the final decision of the Commissioner when the Social Security Administration Appeals Council denied review on September 11, 1998.

On October 5, 1998, Ms. Thomas brought an action in federal district court pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision denying her application for Supplemental Security Income benefits. The district court affirmed the Commissioner's decision and entered judgment on June 18, 1999. Ms. Thomas filed this timely appeal on July 2, 1999.

## STANDARD OF REVIEW

 We review de novo a district court's order affirming the ALJ's decision to deny benefits. *Tackett,* 180 F.3d at 1097. We "may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error." *Jamerson v. Chater,* 112 F.3d 1064, 1066 (9th Cir.1997). "Substantial evidence means more than a scintilla but less than a preponderance." *Id.* (citation and internal quotation marks omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten v. Sec'y of Health & Human Servs.,* 44 F.3d 1453, 1457 (9th Cir.1995). Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld. *See Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir.1999).

## DISCUSSION

Under the Social Security Act, to qualify for disability insurance benefits, a claimant must establish: (1) that she is disabled within the meaning of the Social Security Act, i.e., that she was unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment," 42 U.S.C. § 423(d)(1)(A); (2) that her impairment(s) lasted "for a continuous period of not less than 12 months," *id.; see also* 20 C.F.R. § 404.1509; and (3) that her period of disability began while she was "insured for disability insurance benefits," 42 U.S.C. § 423(a)(1)(A).

 A claimant is disabled if she proves: 1) that she is not presently engaged in a substantial gainful activity; 2) that her disability is severe; and 3) that her impairment meets or equals one of the specific impairments described in the regulations. *Tackett,* 180 F.3d at 1098–99. Even if the specific impairments described in the regulations do not apply, a claimant can make out a prima facie case of disability if she proves, in addition to the first two requirements, that she is not able to perform any work that she has done in the past. *See id.* If the claimant makes out a prima facie case, the burden shifts to the Commissioner to establish that the claimant can perform a significant number of other jobs in the national economy. *See id.* The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. *See id.* at 1099. If the Commissioner meets her burden, the claimant has failed to establish disability. *Id.*

The ALJ found that Ms. Thomas had "not engaged in substantial gainful activity since the protective filing date." The ALJ further found that Ms. Thomas "has one or more medically determinable severe impairments." The ALJ also found that Ms. Thomas "is unable to perform any past work." Ms. Thomas, therefore, established a prima facie case of disability.

However, the ALJ found that both the Medical–Vocational Guidelines and the testimony of the vocational expert ("VE") support the conclusion that Ms. Thomas could perform light and sedentary jobs, of which a significant number are present in the national economy. This finding rebuts the prima facie case of disability established by Ms. Thomas and precludes the award of disability benefits. Ms. Thomas contends that this finding is not supported by substantial evidence in the record and was reached through the application of improper legal standards.

To determine which pertinent jobs were available in the national economy, the ALJ asked the VE to take into account Ms. Thomas' age, education, and literacy. The ALJ further asked that the VE credit Dr. Warner's moderate mental residual functional capacity limitations. The ALJ observed that Dr. Warner's findings were the same as those of Dr. LeBray, except Dr. Warner found that Ms. Thomas' alcoholism was in remission. Accordingly, Dr. Warner did not include in his findings a moderate limitation when working around hazards.

The VE was present for Dr. Warner's testimony and was asked if she had any questions to clarify Ms. Thomas' functional capacity. The VE's response indicated that she absorbed and considered Dr. Warner's expressed limitations when responding to the ALJ's hypothetical. The ALJ also asked the VE to assume that Ms. Thomas could perform less than the full range of light work with no continuous standing or walking. Rather, a sit/stand option was required. Further, the VE was to assume that Ms. Thomas could lift no more than twenty pounds occasionally and that bending was extremely limited. Finally, the VE was asked to consider that Ms. Thomas had mild to moderate carpal tunnel syndrome.

### Findings on Concentration

In order for the testimony of a VE to be considered reliable, the hypothetical posed must include "all of the claimant's functional limitations, both physical and mental" supported by the record. *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir.1995); *see Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir.1997). Ms. Thomas contends that the ALJ's hypothetical was inadequate because the ALJ omitted a finding checked on the ALJ's Psychiatric Review Technique Form ("PRTF") that Ms. Thomas has deficiencies of concentration, persistence or pace, often resulting in a failure to complete tasks in a timely manner.

The functional limitations referred to in the PRTF are those of concentration, persistence and pace. The "failure to complete tasks in a timely manner" is not a functional limitation but the end result of "deficiencies of concentration, persistence or pace." In any event, the ALJ instructed the VE to credit Dr. Warner's opinion. Just before the VE's testimony, Dr. Warner specifically testified that Ms. Thomas had "deficiency to concentration, persistence and pace often." The VE was present for Dr. Warner's testimony and was provided with a copy of the exhibits presented at the hearing, which also included the same finding. The hypothetical to the VE therefore adequately incorporated the functional limitations of concentration, persistence and pace. *Compare Brachtel v. Apfel*, 132 F.3d 417, 420–21 (8th Cir.1997) (holding that ALJ's finding on PRTF that the claimant would often manifest deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner was adequately presented in hypothetical when ALJ included limitations of concentration and pace), *with Newton v. Chater*, 92 F.3d 688, 695 (8th Cir.1996) (holding that ALJ's finding on PRTF that the claimant would often manifest deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner was not adequately presented when ALJ's hypothetical limited the claimant to simple jobs).

Ms. Thomas posits that *Newton* required the ALJ to articulate specifically that she had deficiencies in concentration, persistence or pace. Ms. Thomas argues that the VE could not have been expected to remember her limitations from the record alone. The ruling in *Newton* is distinguishable because the hypothetical relied upon by the ALJ in that case did not incorporate any specific testimony or refer to any other evidence indicating that the claimant suffered deficiencies in concentration, persistence or pace. *See* 92 F.3d at 691. This case is not one where the VE was presented with a voluminous conflicting record, requiring the VE to remember numerous permutations of varying limitations. Rather, the ALJ directed the VE to credit fully a specific portion of the record, which the VE had just heard. As a result, the ALJ's hypothetical adequately incorporated Ms. Thomas' limitation of concentration, persistence and pace. *See Torres v. Sec'y of Health & Human Servs.*, 870 F.2d 742, 745–46 (1st Cir.1989) (holding that an ALJ's hypothetical referring to a limited, unambiguous medical record appropriately included the claimant's limitations).

### Findings on Medical Evidence

Ms. Thomas also contends that the ALJ improperly rejected the opinions of her treating or examining physicians. We disagree.

In *Morgan*, we held that "the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." 169 F.3d at 600. "When there is conflicting medical evidence, the Secre-

tary must determine credibility and resolve the conflict." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir.1992). The ALJ, however, must present clear and convincing reasons for rejecting the uncontroverted opinion of a claimant's physician. *See Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989). Although the treating physician's opinion is given deference, the ALJ may reject the opinion of a treating physician in favor of a conflicting opinion of an examining physician if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Id.* (citation and internal quotation marks omitted). The ALJ can "meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (citation and quotation omitted). The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *See id.; Morgan,* 169 F.3d at 600. The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. *See Matney,* 981 F.2d at 1019.

The ALJ's interpretation of the conflicting medical evidence is supported by substantial evidence included in his factual findings. Although Dr. Groves signed a form on July 21, 1995, to discharge Ms. Thomas' student loans based on an inability to work, Dr. Groves' prior conclusions contradict that form. The ALJ properly relied on Dr. Groves' last examination of record, rather than on Dr. Groves' unsupported statements of disability in the student loan form. In her examination notes, Dr. Groves declined to make a determination of disability but, instead, said that if Ms. Thomas was "on good anti-inflammatory medication she should be able to use her joints in such a way that she could work." The record contains no information to support a change of that opinion.

Dr. Duncan indicated in March of 1995 that Ms. Thomas was disabled due to neck pain and right carpal tunnel syndrome. The ALJ adequately included these limitations in his hypothetical when he asked the VE to assume that Ms. Thomas had "mild to moderate carpal tunnel syndrome" and could perform "less than a full range of light work" with "no lifting over 20 pounds occasionally." The limitations in the ALJ's hypothetical are further supported by a subsequent examination by Dr. Duncan in October of 1995, which reflected that Ms. Thomas' "pain is starting to improve."

The ALJ also correctly referenced Dr. Silver's notes, which stated that from June 1993 to the date of the examination in the fall of 1993, Ms. Thomas was disabled and "unable to work" but that "[s]he is now able to perform some duties which do not involve heavy lifting." The ALJ appropriately placed this limitation in his hypothetical by asking the VE to assume that Ms. Thomas could lift a maximum of "20 pounds occasionally." Although Dr. Silver, at the insistence of Ms. Thomas, revised insurance disability forms to state that Ms. Thomas was totally disabled from June 1993 to January 1, 1994, the ALJ correctly found that this was "not a significant change from [Dr. Silver's] earlier opinion." Additionally, Dr. Silver's new opinion was based on Ms. Thomas' subjective complaints and not on any new objective findings.

The ALJ directed the VE to credit the opinion of Dr. Warner, who testified that Ms. Thomas had "marked limitations [with concentration] over extended periods of

time." This comports with James Wahl's conclusion that "testing suggests some mild to moderate deficiencies of concentration" which "could be expected to result in ... a marked limitation in her ability to maintain concentration over extended periods." Upon being asked if "low ability to concentrate for sustained periods of time" would permit Ms. Thomas "to perform these unskilled jobs," the VE testified that, "[i]f a job is unskilled, the tasks are very simple and I wouldn't think there would be a problem." Nothing in the record reveals inconsistency in the ALJ's findings.

 Ms. Thomas also contends that because the ALJ found the report of the first physical capacity test to be contradictory, he was required to recontact the evaluator to resolve the perceived conflict. Ms. Thomas relies on 20 C.F.R. § 416.912(e) to support her contention. This regulation provides in pertinent part:

> Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

Ms. Thomas' argument is unpersuasive. The regulation applies only to a "treating" source, whether that is a physician, psychologist or other medical source. The evaluator of the first physical capacity test was not a treating source, but was a consultant for Dr. Mize, one of Ms. Thomas' "treating" sources. Moreover, the requirement for additional information is triggered only when the evidence from the treating medical source is inadequate to make a determination as to the claimant's disability. The ALJ did not make a finding that the report was inadequate to make a determination regarding Ms. Thomas' disability. Instead, the ALJ disagreed with the report's finding that a claimant could exaggerate symptoms and still produce a valid test result. In discrediting the report, the ALJ reasoned that a one-hour physical capacity evaluation relies almost entirely on subjective information, and when a claimant exaggerates symptoms, the results cannot be valid.

In summary, the ALJ acted in accordance with his responsibility to determine the credibility of medical evidence, and he gave specific, legitimate reasons for discrediting particular opinions. *See Matney,* 981 F.2d at 1019.

### Ms. Thomas' Credibility

 Ms. Thomas next challenges the ALJ's rejection of her testimony. If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *See Bunnell v. Sullivan,* 947 F.2d 341, 345–46 (9th Cir.1991) (en banc). The ALJ may consider at least the following factors when weighing the claimant's credibility: "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testi-

mony or between [her] testimony and [her] conduct, [claimaint's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Light,* 119 F.3d at 792. If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing. *See Morgan,* 169 F.3d at 600.

██ The ALJ gave specific, clear and convincing reasons for discounting Ms. Thomas' testimony. In addition to finding no objective medical evidence to support Ms. Thomas' descriptions of her pain and limitations, the ALJ found that Ms. Thomas had an "extremely poor work history" and "has shown little propensity to work in her lifetime," which negatively affected her credibility regarding her inability to work. Ms. Thomas' work history was spotty, at best, with years of unemployment between jobs, even before she claimed disability in June of 1993. The ALJ also found that Ms. Thomas was able to perform various household chores such as cooking, laundry, washing dishes, and shopping. Additionally, the ALJ found that Ms. Thomas had not "been a reliable historian, presenting conflicting information about her drug and alcohol usage." Ms. Thomas denied any substance abuse to Dr. Tuan Luu in June 1993 but, in November 1992, admitted to alcoholism and to smoking "a little pot." On March 30, 1994, Ms. Thomas told Diane Conrad that, two weeks earlier, she had been intoxicated and used marijuana, but on April 14, 1994, she told James Wahl that she had not drunk alcohol for "several months" and "had not smoked marijuana for about a year." The ALJ inferred "that this lack of candor carries over to her description of physical pain." This substantial evidence in the record supports the ALJ's negative conclusions about Ms. Thomas' veracity. *See Verduzco v. Apfel,* 188 F.3d, 1087, 1090 (9th Cir.1999) (relying on inconsistent statements about alcohol use to reject claimant's testimony).

Even more compelling is the ALJ's finding, supported by the record, that Ms. Thomas failed to give maximum or consistent effort during two physical capacity evaluations. The ALJ interpreted Ms. Thomas' self-limiting behaviors to "argue strongly as to her lack of credibility." Ms. Thomas' efforts to impede accurate testing of her limitations supports the ALJ's determinations as to her lack of credibility. *See Rautio v. Bowen,* 862 F.2d 176, 179–80 (8th Cir.1988) (determining that failure to cooperate during examinations supported ALJ's conclusion that claimant was not credible). The ALJ's findings support his conclusion that Ms. Thomas was not credible with regard to her limitations and pain.

Having determined that Ms. Thomas' subjective complaints of pain were not credible, the ALJ had no need to explore whether Ms. Thomas' pain was psychologically related, because pain is subjective and depends on the credibility of the claimant. *See Bunnell,* 947 F.2d at 347 (characterizing pain as a completely subjective phenomenon). Likewise, the ALJ need not have included Ms. Thomas' use of a cane or wheelchair in his hypothetical. While the record contains conclusory statements that Ms. Thomas needed a cane, the only objective medical evidence of a required assistive device was a wrist splint prescribed for her carpal tunnel syndrome. Without objective medical evidence that Ms. Thomas needed a cane or wheelchair, and in light of the ALJ's findings with respect to Ms. Thomas' lack of credibility, there was no reason to include Ms. Thomas' subjective use of those devices in the hypothetical to the VE. *See Copeland v. Bowen,* 861 F.2d 536, 540–41 (9th Cir.1988) (holding that hypothetical question need not include claimant's subjective impair-

ments if the ALJ makes specific findings that claimant is not credible). Moreover, the ALJ's hypothetical incorporated the option of sitting while working. Therefore, Ms. Thomas' alleged use of a cane or wheelchair would be irrelevant.

Ms. Thomas also claims that the ALJ improperly excluded the side effects of dizziness and difficulties in concentration caused by her pain medication. Again, Ms. Thomas offers no objective evidence that her medications affected her concentration or caused dizziness. The only evidence regarding these symptoms is Ms. Thomas' own statements to her doctor and her testimony at the hearing. While Ms. Thomas' testimony cannot be rejected solely because the objective medical evidence does not support the severity of her impairment, the ALJ properly rejected her testimony by using "ordinary techniques of credibility evaluation" and providing a specific, clear and convincing reason, supported by the record, that her testimony was generally not credible. *Bunnell,* 947 F.2d at 346; *see also Light,* 119 F.3d at 792 (upholding ALJ's finding that a claimant generally lacks credibility as a permissible basis for rejecting claimant's testimony). For example, the ALJ relied on Ms. Thomas' demeanor at the hearing and found that "she seemed to engage in considerable histrionic exaggeration."

### Use of the Medical Vocational Guidelines

■ Finally, Ms. Thomas asserts that the ALJ failed to apply the medical vocational guidelines (the "Grids") properly. The Grids are used to determine whether substantial gainful work exists for the claimant with respect to substantially uniform levels of impairment. *See Moore v. Apfel,* 216 F.3d 864, 869 (9th Cir.2000). When they do not adequately take into account claimant's abilities and limitations, the Grids are to be used only as a frame-

work, and a vocational expert must be consulted. *Id.* at 869–70.

■ Ms. Thomas correctly notes that, if she were limited to sedentary work, she would be deemed disabled under the Grids. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.12. Ms. Thomas also correctly notes that, if she were able to perform a full range of light work, she would not be considered disabled under the Grids. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.13. Ms. Thomas asserts that, because the ALJ found that she "could perform less [than] a full range of light work," he erred by not addressing how severely the number of light jobs were reduced due to Ms. Thomas' limitations. In *Moore,* however, we held that when a claimant's exertional limitation falls between two grid rules, the ALJ fulfills his obligation to determine the claimant's occupational base by consulting a vocational expert regarding whether a person with claimant's profile could perform substantial gainful work in the economy. *See* 216 F.3d at 870–71 (citing SSR 83–12).

The procedure articulated in *Moore* is precisely the procedure followed by the ALJ in the present case. The VE testified that Ms. Thomas could perform the jobs of office helper (light, unskilled), surveillance system monitor (sedentary, unskilled), and clerk (sedentary, unskilled), which respectively represented 492,000, 100,000 and 30,000 jobs in the national economy and 1,000, 200 and 100 jobs in Oregon. Because the VE testified that Ms. Thomas could perform one of 622,000 jobs in the national economy and 1,300 jobs in Oregon, substantial evidence supports the ALJ's finding that Ms. Thomas was "not disabled." *See Moncada v. Chater,* 60 F.3d 521, 524 (9th Cir.1995) (finding 2,300 jobs in the county and 64,000 nationwide to be sufficient); *Barker v. Sec'y of Health & Human Servs.,* 882 F.2d 1474, 1478–79

(9th Cir.1989) (citing with approval decisions finding several hundred jobs "significant" for purposes of determining a claimant's residual functional capacity).

### CONCLUSION

The Social Security Administration Commissioner's decision denying Ms. Thomas' application for Supplemental Security Income benefits was supported by substantial evidence in the record. Accordingly, the judgment of the district court is

**AFFIRMED.**