Kristina K. HARRELSON, Plaintiff—Appellant

v.

Michael J. ASTRUE *, Commissioner of Social Security Administration, Defendant—Appellee.

No. 06–35284.

United States Court of Appeals, Ninth Circuit.

Submitted March 7, 2008.**

Filed April 10, 2008.

---

\* Michael J. Astrue is substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R.App. P. 43(c)(2).

\*\* The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Alan Stuart Graf, Esq., Summertown, TN, for Plaintiff–Appellant.

Neil J. Evans, Esq., USPO—Office of the U.S. Attorney, Portland, OR, Lucille G. Meis, Esq., Stephanie Martz, Esq., SSA—Social Security Administration, Seattle, WA, for Defendant–Appellee.

Before: BERZON and BEA, Circuit Judges, and GUTIERREZ ***, District Judge.

*** The Honorable Philip S. Gutierrez, United States District Judge for the Central District of California, sitting by designation.

## MEMORANDUM ****

Petitioner Kristina Harrelson ("Harrelson") filed an application for Supplemental Security Income on January 15, 2002. Harrelson, who was diagnosed with fibromyalgia, claimed to suffer from sharp shooting pains in the scapula, chest, and sciatic area, right hip pain, chronic fatigue, depression and anxiety. On September 26, 2003, an Administrative Law Judge ("ALJ") found that Harrelson was not disabled and thus not entitled to supplemental security benefits. Harrelson thereafter filed suit in the District of Oregon challenging the Commissioner's determination. On January 26, 2006, the district court issued an order affirming the ALJ's decision.

Because the parties are familiar with the remaining facts and procedural history, we do not reiterate them here unless necessary to explain this disposition.

### I.

We review *de novo* the district court's order upholding a decision of the Commissioner denying benefits to an applicant. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir.2004). We must affirm the Commissioner's decision if supported by substantial evidence in the record as a whole, and if the Commissioner applied the correct legal standards. *Id.* "Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.1999). If the record would support more than one rational interpretation, we will defer to the Commissioner's decision.

**** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

*See Morgan v. Commissioner,* 169 F.3d 595, 599 (9th Cir.1999).

## II.

■ The ALJ did not err in discrediting Harrelson's testimony regarding the extent of her pain. The ALJ provided "clear and convincing" reasons justifying his decision that Harrelson's testimony was not fully credible. *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). The ALJ acknowledged that Harrelson reported pain but noted that: (1) there were inconsistencies between Harrelson's reported pain and the physicians' records, *see Thomas v. Barnhart,* 278 F.3d 947, 958–959 (9th Cir. 2002) ("The ALJ may consider ... inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct. ...' "); (2) Harrelson quit work for religious reasons rather than for any physical or mental impairment, *see Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001) (affirming the ALJ's adverse credibility determination based in part because the claimant told the ALJ that he left his job because he was laid off, rather than because he was injured); (3) none of the physicians indicated she was disabled; (4) Dr. Eckstein, in her psychological evaluation, opined that Harrelson may have been presenting herself as more psychologically disturbed than was actually the case; and (5) Harrelson was uncooperative with the consultive psychological examination by Dr. Villaneuva, *see Thomas,* 278 F.3d at 959 (finding that claimant's efforts to impede accurate testing of her limitations supported the ALJ's determination as to her lack of credibility). The ALJ also justified his adverse credibility determination in part because Harrelson was not honest about her use of alcohol and her DUI history, and because her doctors had expressed concern regarding misuse of pain medications. Although we find that the record does not support these latter two reasons, we nevertheless conclude that the other reasons cited by the ALJ provide clear and convincing evidence for the ALJ's adverse credibility determination.

The ALJ did not improperly ignore or reject key opinions from examining physician, Dr. Eckstein, and treating physician, Dr. Anderson. Because treating physicians "have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians." *Smolen,* 80 F.3d at 1285 (citations omitted). "Therefore, an ALJ may not reject treating physicians' opinions unless he 'makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.' " *Id.* (quoting *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989)).

■ Here, the ALJ noted that Dr. Eckstein premised her opinions on the acceptance of Harrelson's statements, which the ALJ found lacked credibility. *See Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir.2001) ("When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings"). As for Dr. Anderson, Harrelson argues that he made a disability determination by stating that her fibromyalgia was "significantly disabling" for her. However, because Dr. Anderson never mentions any functional limitations, we conclude that he was merely expressing his opinion that Harrelson's symptoms were causing her significant problems, rather than expressing an opinion regarding her ability to work based on disability.

■ Finally, the ALJ properly made findings consistent with the opinions of state agency psychologists Dr. Bates–Smith and Dr. Rethinger. Dr. Bates–Smith and Dr. Rethinger concluded that

Harrelson could "understand and remember simple instructions," "attend to simple tasks," and "get along with coworkers and supervisors." Based on these conclusions, they recommended that Harrelson "avoid complex tasks" and keep "a simple routine w/limited changes in work setting." The ALJ's determination that Harrelson should not perform detailed or complex work, should avoid public service jobs, and was able to perform light work is entirely consistent with Dr. Bates–Smith's and Dr. Rethinger's findings.

**AFFIRMED.**

BERZON, Circuit Judge, dissenting:

I respectfully dissent. The majority accepts five of the ALJ's seven reasons for rejecting Harrelson's subjective pain testimony. In fact, only one incident relied upon by the ALJ actually undermines her credibility. I would remand to the ALJ for consideration of whether he would reject Harrelson's pain testimony based on that single incident alone.

1. The ALJ found Harrelson's testimony of extreme pain "inconsistent with reports to physicians." Harrelson's reports to doctors plainly indicate some progress as certain treatments—namely, methadone—proved helpful to ease the pain. But the record indicates that, even after starting methadone, Harrelson complained about serious pain.

The chronology of her reports of pain is worth recounting in some detail. In December 2000, she reported "pain in her back, buttocks, and down her right leg.... She states that her low back pain is worse when she sits or stands and she just doesn't sit or stand for very long." In October 2001, she reported pain " 'like a knife' ... so severe she feels a pulling and numbness on the right side of her face ... [and] sharp, shooting pains radiating down the triceps region." In January 2002, she rated "her current pain at 5/10 if, and only if, she takes 9 to 12 Ultram per day.... She is particularly painful in the morning, and describes the severity as 10/10, or as intense as the pain of labor." In February 2002, her doctor noted that her fibromyalgic symptoms were "quite severe [and] ... required treatment with agents as strong as MS Contin ... [although despite the medication she is] still having some problems." In March, after switching to OxyContin, her doctor reported that "[s]he has done well with the 20 mg of OxyContin but apparently needs an increase in her dosage." In May 2002, after an increase in the dosage of OxyContin, her doctor noted that she "has had some positive changes as far as her fibromyalgia, with further reduction in her pain level, ... [but] at best she is probably 60% improved."

In July 2002, she switched from Oxy-Contin to methadone. Harrelson apparently responded well to methadone: In August she reported that "with medications her pain is a 5/10. Without medications, she reports her pain to be a 10+/10. Patient states she is happy to have the extra mobility with the pain medications." By September she said that "her pain management is good" and the following month reported being "quite happy ... with current meds working well and pain well controlled." In November she was "doing a whole lot better, primarily because of methadone management for chronic pain along with breakthrough medication including Norco."

But in December, indications of continued pain problems emerge. Although Harrelson reported being "happy with pain control," she requested a hospital bed because she had "continuing difficulty getting out of the bed. By this she apparently means that she is stiff and sore in the morning and it is hard to extricate her-

self." The following month, she complained that "her pain is no better, and it is still hard to move, especially in the morning on awakening." In March 2003, her doctor noted that her fibromyalgia "is significantly disabling fore [sic] her."[1]

In sum, Harrelson plainly received some benefit from switching to methadone for pain management. Her initial reports of improvement were quite strong, perhaps because her *relative* pain decreased. In other words, she originally suffered from such excruciating pain that any reduction was cause for celebration. But she did continue to complain about pain. "Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability." *Lester v. Chater,* 81 F.3d 821, 833 (9th Cir.1995).

There was one incident cited by the ALJ, however, that to some degree undermines Harrelson's credibility. On November 8, 2002, Harrelson's doctor noted that her "appearance is dramatically better" than it was in July, before she started methadone treatment. She had gained weight and was "doing a whole lot better, primarily because of methadone management for chronic pain along with breakthrough medication including Norco." Six days later, Harrelson filed her reconsideration report with the Social Security Administration. In the report she stated "I can hardly get out of bed" and "I can't move without extreme pain." She also claimed to "have gotten much worse [since filing the initial claim]. Mobility has greatly decreased." The proximity and contrast of these two reports constitutes evidence weighing against her credibility.

2. The ALJ noted that "there is no indication [Harrelson] stopped working [at her last job] due to any physical or mental impairment." There is no reason this fact is inconsistent with her subjective pain testimony. She left the job in February 2000, the same month she claims to have become disabled. She testified that after she was laid off, "I started looking for work, but with my health the way it was, I wasn't having any success." Under these circumstances, the fact that the onset of her disability coincided with her being fired for unrelated reasons is no reason to discount her testimony. *See Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir.1993) (fact that claimant "left her last job not because of medical necessity, but to follow her husband to the State of Washington when he retired" not sufficient to reject her subjective pain testimony); *cf. Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001) (fact that claimant left last job for reasons unrelated to disability *is* relevant when claimed disability stemmed from injury taking place a week and a half prior to termination and there was no allegation of a delay between the injury and the onset of the disability).

3. The ALJ noted that "[n]one of [Harrelson's] treating physicians has indicated that she is disabled." This gap is not a reason to disbelieve her pain testimony. First, "the adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence." *Bunnell v. Sullivan,* 947 F.2d 341, 346–47 (9th Cir.1991) (en banc). Further, as noted above, her treating physicians largely *did* corroborate her testimony of pain. Their belief in her complaints of pain is best illustrated by their willingness to prescribe her large doses of extremely serious

---

1. Regardless of whether the doctor meant she was legally disabled, he at least meant, as the majority concludes, that her "symptoms were causing her significant problems." Maj. op. 634.

pain medications. That no doctor specifically commented that she was disabled does not contradict her pain testimony.

4. Dr. Eckstein found indications of questionable validity in the results of a psychological test taken by Harrelson. But this concern reflects only upon Harrelson's reporting of her *psychological* condition, not her physical pain.

5. In January 2003, Harrelson was examined by psychiatrist Dr. Villaneuva. After conducting an interview and various tests, Dr. Villaneuva asked Harrelson to take an additional psychological test. Harrelson complained that his office was cold and left without completing the test. Although Dr. Villaneuva asked her to return to take the test, she did not. Again, this concern about Harrelson's cooperation with a psychological examination should have no bearing on her testimony about physical pain.

\*    \*    \*

In sum, only one incident relied upon by the ALJ could be used to support a finding that Harrelson's pain testimony was not credible: The contrast between her report of pain in her reconsideration report and at a doctor's visit less than a week earlier. Although this single incident could possibly constitute the requisite "clear and convincing" evidence sufficient to reject Harrelson's subjective pain testimony, the ALJ did not so find. I would remand to the ALJ for a determination whether he finds this sole incident clear and convincing evidence that Harrelson is not credible regarding her degree of pain.

I respectfully dissent.