Salvador DOMINGUEZ, Jr., Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner of Social Security,[1] Defendant.

Case No. EDCV 12–0301–JPR.

United States District Court, C.D. California.

Feb. 26, 2013.

**1.** On February 14, 2013, Colvin became the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

William M. Kuntz, Riverside, CA, for Plaintiff.

Dennis J. Hanna, SAUSA–US Attorney's Office, San Francisco, Assistant US Attorney LA–CV, AUSA–Office of US Attorney, Los Angeles, CA, Assistant US Attorney LA–SSA, Office of the General Counsel for Social Security Adm., for Defendant.

## MEMORANDUM OPINION AND ORDER AFFIRMING THE COMMISSIONER

JEAN ROSENBLUTH, United States Magistrate Judge.

### I. PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed October 22, 2012, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

### II. BACKGROUND

Plaintiff was born on February 21, 1968. (Administrative Record ("AR") 211.) He has a high-school education. (*Id.*) Plaintiff previously worked as a collection supervisor at a collection agency and as a self-

employed collector and server of delinquency letters. (AR 212–13.)

On November 14, 2007, Plaintiff filed an application for DIB, and on December 5, 2007, he filed an application for SSI. (AR 22, 277–79, 281–85.) Plaintiff alleged that he had been unable to work since October 5, 2007, because of a stroke, recurring transient ischemic attacks ("TIA"), depression, and fibromyalgia, among other things.[2] (AR 277, 281, 335, 345, 387.)

After Plaintiff's applications were denied, he requested a hearing before an ALJ. (AR 236–40, 245–49, 251.) A hearing was held on September 23, 2009, at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert ("VE"). (AR 208–31.) The ALJ, however, determined that the record was not complete and postponed the case. (AR 230.) A supplemental hearing was held on January 20, 2010, at which Plaintiff, who was still represented by counsel, appeared and testified, as did a different VE and medical expert Dr. Arnold Ostrow. (AR 173–207.) In a written decision issued on April 1, 2010, the ALJ determined that Plaintiff was not disabled. (AR 22–32.) On January 4, 2012, the Appeals Council denied Plaintiff's request for review. (AR 1–5.) This action followed.

## III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. § 405(g); *Richardson v. Pe-*

*rales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Parra v. Astrue,* 481 F.3d 742, 746 (9th Cir.2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420; *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir.2007). It is more than a scintilla but less than a preponderance. *Lingenfelter,* 504 F.3d at 1035 (citing *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir.2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater,* 157 F.3d 715, 720 (9th Cir.1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. *Id.* at 720–21.

## IV. THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); *Drouin v. Sullivan,* 966 F.2d 1255, 1257 (9th Cir.1992).

### A. *The Five–Step Evaluation Process*

The ALJ follows a five-step sequential evaluation process in assessing whether a

---

**2.** A TIA occurs when blood flow to a part of the brain stops for a brief period of time. *Transient ischemic attack,* PubMed Health, U.S. Nat'l Library of Medicine (May 21, 2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001743/. A person who suffers a TIA "will have stroke-like symptoms for up to 24 hours, but in most cases for 1–2 hours." *Id.* After a TIA, the blockage breaks up quickly and dissolves; unlike a stroke, it does not cause brain tissue to die. *Id.* A TIA may be a "warning sign" of a coming stroke and is considered a "medical emergency." *Id.*

claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir.1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform his past work; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving that he is unable to perform past relevant work. *Drouin*, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. *Id.* If that happens or if the claimant has no past

relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis. §§ 404.1520, 416.920; *Lester*, 81 F.3d at 828 n. 5; *Drouin*, 966 F.2d at 1257.

## B. *The ALJ's Application of the Five-Step Process*

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since October 5, 2007. (AR 24.) At step two, the ALJ concluded that Plaintiff had the severe impairments of "status post 1991 cervical spinal fracture," "status post posterior lumbar spinal fusion," morbid obesity, obstructive sleep apnea, "history of [TIAs]," and psoriasis. (AR 24–26.) He concluded that Plaintiff's "renal failure/sepsis," diabetes mellitus, TIAs, depression, fibromyalgia, and hypertension were nonsevere. (*Id.*) At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing. (AR 26.) At step four, the ALJ found that Plaintiff retained the RFC to perform "sedentary work" with certain additional limitations. (*Id.*) Based on the VE's testimony, the ALJ concluded that Plaintiff could perform his past work as a collector at a collection agency as it was generally performed. (AR 30–31.) Alternatively, at step five, the ALJ concluded that Plaintiff was not disabled under the framework of the Medical–Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and that jobs existed in significant numbers in the national economy that Plaintiff could per-

---

**3.** RFC is what a claimant can still do despite existing exertional and nonexertional limitations. 20 C.F.R. §§ 404.1545, 416.945; *see*

*Cooper v. Sullivan*, 880 F.2d 1152, 1155 n. 5 (9th Cir.1989).

form. (AR 31–32.) Accordingly, the ALJ determined that Plaintiff was not disabled. (AR 32.)

## V. RELEVANT FACTS

On October 5, 2007, Plaintiff was seen in the emergency room for complaints of weakness and chest pain. (AR 422.) At discharge, Plaintiff was noted to be ambulating without assistance. (AR 424.) On October 19, 2007, Plaintiff was again seen in the emergency room and was noted to be suffering from nonischemic chest pain and anxiety. (AR 415.)

On January 14, 2008, Plaintiff was admitted to the hospital for complaints of right-side weakness and slurred speech, both of which had been going on "for quite a long time." (AR 618, 620–21.) Plaintiff also complained of back pain and was noted on admission to have high blood pressure. (AR 618.) A brain MRI, brain MR angiogram, and cervical-spine CT scan were normal, but a lumbar-spine CT scan showed bilateral L5 spondylolysis. (AR 132, 460–61, 639–40.) Dr. Chenna Reddy Mallu diagnosed "possible transient ischemic attack," "slurred speech which is longstanding," "[r]ight-sided weakness which is longstanding," and back pain.[4] (AR 618.) Plaintiff was discharged after an overnight stay. (AR 618–19.) On January 25, 2008, Dr. Reddy noted that Plaintiff had chronic back pain, obesity, hypertension, elevated triglycerides, and a two-year history of slow speech. (AR 531.)

On February 24, 2008, Dr. Reddy noted that Plaintiff had slow speech and sent him to the emergency room. (AR 530.) Plaintiff was admitted to the hospital with slurred speech and right-leg weakness. (AR 436, 441–42, 448–49.) He was noted to have a history of hypertension, hyperli-

pidemia, morbid obesity, possible sleep apnea, and hypertriglyceridemia. (AR 441.) A brain MRI, cerebral MR angiogram, and cervical-spine MRI were normal. (AR 131, 459, 463–64.) On February 25, 2008, Dr. Bhupat H. Desai performed a neurology consultation, noting that Plaintiff reported developing right-side weakness and numbness and abnormal and stuttering speech after October 2007, had dizziness, and had started using a cane. (AR 444.) Dr. Desai noted that Plaintiff had "mild drift of extended right arm," "moderate weakness" in right-lower extremity, reduced "[r]apid alternating movements on the right side," and "slightly brisk" deep tendon reflexes. (AR 445.) Dr. Desai concluded that Plaintiff's "history and findings" were "consistent with acute ischemic stroke, possibly brain stem with residual neurological deficit." (AR 444–46.)

On February 26, 2008, Dr. Reddy noted that MRIs of Plaintiff's brain and cervical spine were negative and a lumbar puncture was "essentially negative" except for elevated protein. (AR 436, 605.) Dr. Reddy's discharge diagnoses were "[p]ossible cerebrovascular accident in the brainstem with residual neurological defects," morbid obesity, hyperlipidemia, hypertension, and metabolic syndrome. (AR 436.)

On February 29, 2008, Dr. Sarah L. Maze examined Plaintiff at the Social Security Administration's request. (AR 467–70.) She noted that Plaintiff had weakness in the right side of his body, was forgetful, and had "poor balance" in his hands. (AR 467.) Dr. Maze observed that Plaintiff had a "very bizarre speech pattern at times speaking in a normal matter and at times speaking with a stutter that is not consistent," "chang[ing] from word to

---

4. Notes in the record variously refer to a doctor named Mallu C. Reddy (*see, e.g.,* AR 531), Chenna Reddy Mallu (*see, e.g.,* AR 605), and Chenna R. Mallu (*see, e.g.,* AR 618). Because these names all appear to refer to the same doctor, the Court refers to him uniformly as "Dr. Reddy."

word," and that Plaintiff's speech pattern improved "considerably" when he was distracted. (AR 468.) She also noted that Plaintiff's language could be understood. (*Id.*) She found that Plaintiff had normal intelligence, intact sensation, and decreased reflexes on the left. (AR 468–69.) Plaintiff's motor function was 5/5 throughout except for finger abduction on the right, which was "5–/5." (*Id.*) His grip strength was 35/35/35 on the right and 95/95/95 on the left. (AR 469.) He brought a walker to the examination but left it outside and walked to a chair in the examination room. (*Id.*) She noted that Plaintiff was able to walk independently. (*Id.*)

Dr. Maze concluded that Plaintiff had "an unusual speech pattern not resembling dysarthria or aphasia" and "reflex asymmetry suggesting that there was a small cerebral event." (AR 469.) She believed that there was a "component of non-organic overlay in the clinical presentation."[5] (*Id.*) Dr. Maze diagnosed "[h]istory of stroke" and opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand and walk for two hours in an eight-hour day, and perform fine motor activities with his arms and legs. (AR 470.)

On March 10, 2008, Dr. Reddy noted that Plaintiff had a history of "CVA," or cerebro-vascular accident, *see* Luis R. De-Sousa et al., *Common Medical Abbreviations* 58 (1995), and complained of stuttering speech (AR 158). Dr. Reddy noted that Plaintiff had diet-controlled diabetes and referred him to Dr. Ali Mesiwala, at the Southern California Center for Neuroscience and Spine, for treatment of disc prolapse, and to neurology and physical therapy. (*Id.*)

On March 25, 2008, state-agency consultant Dr. Franklin Kalmar reviewed the medical evidence in Plaintiff's file and completed a Physical Residual Functional Capacity Assessment. (AR 471–77.) Dr. Kalmar opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk for at least two hours in an eight-hour day, sit for about six hours in an eight-hour day, and perform unlimited pushing and pulling. (AR 472.) He could never climb ladders, ropes, or scaffolds, but he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (AR 473.) Plaintiff also needed to avoid concentrated exposure to extreme heat and cold, vibration, and hazards. (AR 474.)

On April 17, 2008, a CT of Plaintiff's head was normal. (AR 130.) On April 29, 2008, Dr. Reddy noted that Plaintiff complained of right-side weakness and slow speech that had been going on for four months. (AR 157.) Dr. Reddy's assessment was "brain stem CVA," diet-controlled diabetes, elevated lipids, hypertension, and "? OSA," or questionable obstructive sleep apnea.[6] (*Id.*)

On May 13, 2008, Dr. Mesiwala noted that Plaintiff complained of neck and low-back pain radiating into both legs, with associated numbness and tingling. (AR 110.) Dr. Mesiwala examined Plaintiff and found that he had "slow and broken" speech but intact memory. (*Id.*) Plaintiff had 4+/5 strength diffusely on the right side and 5/5 strength on the left. (*Id.*) His sensation on the right side was decreased to light touch and pinprick. (*Id.*) He had no evidence of cerebellar dysfunction, his gait was slow, and he used a cane. (AR 110–11.) Plaintiff's reflexes were 1+ on

---

5. Overlay is "[a]n addition to an already existing condition." *Stedman's Medical Dictionary* 1290 (27th ed. 2000).

6. OSA is a common medical abbreviation for obstructive sleep apnea. DeSousa, *supra,* at 165. The symbol "?" indicates "doubtful" or "questionable." *Id.* at 257.

the left and absent on the right. (AR 111.) Dr. Mesiwala noted that a CT of Plaintiff's spine showed L5 spondylolysis that "may be causing low back pain and radiculopathy," whereas Plaintiff's neck and right-hemisphere abnormalities were likely a result of his stroke. (*Id.*) Dr. Mesiwala ordered a lumbar-spine MRI. (*Id.*)

On June 23, 2008, state-agency consultant Dr. Leonore C. Limos affirmed Dr. Kalmar's March 2008 RFC. (AR 484.) On July 7, 2008, Dr. Reddy noted that Plaintiff suffered from fibromyalgia, obesity, depression, and elevated lipids. (AR 156.) On August 12, 2008, Dr. Mesiwala noted that an MRI of Plaintiff's lumbar spine showed an L5 pars defect with resultant L5–S1 facet degeneration and hypertrophy, which caused "moderate to severe bilateral L5–S1 foraminal stenosis." (AR 108, 125–26.) Dr. Mesiwala recommended "an operation in which [Plaintiff's] L5 posterior elements are removed, his spinal nerves are decompressed, and he has a fusion." (*Id.*)

In an undated note that appears to have been faxed to the Social Security Administration on August 19, 2008, Dr. Reddy stated that Plaintiff had a history of stroke and suffered from fibromyalgia, "spine disk prolapsed," diabetes, and depression. (AR 500.) Dr. Reddy opined that because of Plaintiff's "health condition he is not able to work." (*Id.*) On September 5, 2008, Dr. Reddy wrote a note "to whom it may concern," stating that Plaintiff had "multiple medical problems" and was "permanently disabled."[7] (AR 154.)

On September 8, 2008, Dr. Mesiwala performed the recommended surgery on Plaintiff's lumbar spine. (AR 133–36.) On September 10, 2008, a physical therapist noted that Plaintiff had been walking with a cane and that his physical-therapy goals included ambulating 50 feet with a front-wheeled walker within one week and 150 feet within two weeks. (AR 802–03.) On September 12, 2008, x-rays showed L5–S1 posterior fusion. (AR 123, 577.) Dr. Mesiwala noted that Plaintiff had made an "uneventful" recovery and discharged him from the hospital. (AR 141.) Dr. Mesiwala instructed Plaintiff to participate in activities as tolerated but to wear a brace when out of bed. (*Id.*) That same day, a front-wheeled walker was delivered to Plaintiff. (AR 731.)

On September 25, 2008, Dr. Mesiwala wrote a letter to the Social Security Administration, stating that Plaintiff had undergone "major spine surgery" in September 2008 and would "likely be unable to work for approximately three months." (AR 678.) Dr. Mesiwala believed that as a result of the surgery, Plaintiff would likely have "a 90% improvement" in pain and tingling in his legs but noted that there was "no guarantee" that Plaintiff's low-back pain would be relieved. (*Id.*)

On October 7, 2008, Plaintiff was admitted to the hospital for treatment of an infection of his surgical wound. (AR 137–39, 647–48, 653–54, 657–58, 663–64.) Dr. Luong Thanh Ly performed an infectious-disease consultation and found that Plaintiff had an infection of his surgery site; psoriasis; "[c]erebrovascular accident weakness of the extremities, chronic and stable"; and hypercholesterolemia. (AR 658.) Plaintiff was treated with intravenous antibiotics. (AR 647, 658.) On October 8, 2008, Dr. Mesiwala noted that Plaintiff had "fluent" speech and intact memory and that he was feeling "much better" since starting antibiotics. (AR 137–39.) Dr. Mesiwala noted that Plaintiff had "no new neurologic deficits, in terms of lower

---

7. The ALJ and the parties referred to this note as being dated April 5, 2008 (AR 27–28; J. Stip. at 5, 14), but the best of several copies in the record clearly reflects a date of "9–5–08" (*compare* AR 154 *with* AR 537).

extremity strength and sensation." (AR 138.) On October 10, 2008, Dr. Reddy noted that Plaintiff's infection was under control, and he was discharged from the hospital. (AR 647.)

On October 14, 2008, Dr. Reddy wrote a letter to the Social Security Administration, stating that Plaintiff had suffered a "TIA stroke" on October 5, 2007, had been diagnosed with fibromyalgia and hypertension, and was "[c]linically [d]epressed." (AR 502.) Dr. Reddy stated that Plaintiff experienced "minor TIA strokes constantly, which causes the left side of his head to swell instantly, it becomes very warm to the touch and the body shakes in controllably [sic] for several minutes." (Id.) He stated that Plaintiff "has been determined to be permanently disabled due these [sic] conditions." (Id.) Dr. Reddy stated that Plaintiff "cannot be restored to health" and "will experience discomfort, pain and always have the fear that he will have a major or a series of major TIA Strokes." (AR 503.) Dr. Reddy noted that Plaintiff had undergone spinal surgery in September 2008, which limited his ability to "perform daily activities, such as sitting or standing for long periods of time," and his "range to bend, to lift heavy objects or twist [was] very limited." (Id.)

On October 15, 2008, Dr. Reddy noted that Plaintiff reported experiencing mood swings. (AR 153.) On January 8, 2009, Dr. Reddy noted that Plaintiff had obesity, obstructive sleep apnea, and hypertension. (AR 152.)

On March 3, 2009, Dr. Reddy noted that Plaintiff weighed 304 pounds and suffered from obesity, "SZ," or seizure, see DeSousa, supra, at 218, and hypertension. (AR 151.) In April 2009, Dr. Reddy noted that Plaintiff weighed 306 pounds and suffered from obesity, chronic back pain, hypertension, and "? SZ," presumably, questionable seizure. (AR 150.)

On May 5, 2009, in a note cosigned by Dr. Mesiwala, physician's assistant John DeVere assessed Plaintiff as having "[s]tatus post posterior lumbar spinal fusion due to spondylotic spondylolisthesis at L5–S1" and noted that x-rays showed good positioning of the hardware. (AR 755.) Physical examination revealed that Plaintiff was "severely, grossly obese." (Id.) Plaintiff was having ongoing back and left-leg pain and had restricted range of motion of the lumbar spine and difficulty twisting and turning "because of pain and because of [his] size." (Id.) Plaintiff, however, was ambulating "without difficulty" and had a negative straight-leg raise, "5/5 strength," and grossly intact sensation and motor function. (Id.) DeVere noted that they would continue monitoring Plaintiff and had encouraged him to lose weight or undergo a procedure like lap-band or gastric-bypass surgery. (Id.)

In another note that was also dated May 5, 2009, and cosigned by Dr. Mesiwala, DeVere noted that "the excessive weight that [Plaintiff] has been gaining and the amount of weight that he has at this point in time is hindering his recovery and increasing the potential probability of not healing as well." (AR 103, 730.) They were "quite concerned" because Plaintiff's bone did not appear to be "completely fused," and he "may later this year need further studies to verify the osseous fusion has occurred." (Id.) If not, and if pain continued to be "a pressing issue," then they "may be considering anterior lumbar interbody at L5–S1." (Id.) DeVere noted that they hoped to avoid that surgery, however, by having Plaintiff "go through a procedure such as lap band or gastric bypass surgery in which he can reduce his weight." (Id.) He concluded that Plaintiff's weight was "causing increasing pressure and we are concerned about possible non-union at this time." (Id.)

On May 6, 2009, Dr. Reddy completed a Functional Capacity Questionnaire, stating that he had been treating Plaintiff since January 2008. (AR 549.) He listed Plaintiff's diagnoses as "CVA," obesity, chronic back pain, hypertension, and depression. (*Id.*) Dr. Reddy listed Plaintiff's symptoms as "depression" and "muscle weakness." (*Id.*) He did not check the box that indicated that Plaintiff had been "prescribed [a] cane or other walking device." (*Id.*) Dr. Reddy opined that Plaintiff could "rarely" lift and carry less than 10 pounds and never more than that; his pain would "frequently" interfere with the attention and concentration needed to perform even simple work tasks; and he would miss more than four days of work a month because of his impairments or medical treatment. (*Id.*) Dr. Reddy believed that Plaintiff was unable to work in any occupation. (*Id.*)

On May 22, 2009, Dr. Gisella V. Olivares noted that Plaintiff's complaints included a history of "prior stroke" and high blood pressure, back problems and a possible need for another back surgery, and fibromyalgia. (AR 727.) Under "assessment," Dr. Olivares listed benign essential hypertension, transient cerebral ischemia, and "myalgia and myositis unspecified." (*Id.*)

On June 29, 2009, Dr. Olivares noted that Plaintiff thought that he had been having seizures and wanted disability forms filled out. (AR 725.) Her assessment was diabetes mellitus without complication, "myalgia and myositis unspecified," and "localization-related epilepsy and epileptic syndromes with simple partial seizures." (*Id.*) She noted that Plaintiff needed authorization for a neurologist, started him on glucophage for his diabetes, and filled out his disability forms. (*Id.*)

On July 9, 2009, Dr. Olivares completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Impairments Results from a Stroke. (AR 543–48.) Dr. Olivares stated that Plaintiff

had had a stroke and that he suffered from loss of manual dexterity, weakness, unstable walking, falling spells, numbness or tingling, pain, fatigue, bladder problems, vertigo or dizziness, headaches, difficulty remembering, confusion, depression, emotional ability, personality change, blurred vision, and a shaking tremor. (AR 543.) She indicated that Plaintiff had "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station." (AR 544.) She believed that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations, his impairments were reasonably consistent with his symptoms and limitations, and his pain and other symptoms constantly interfered with his attention and concentration. (*Id.*) She opined that Plaintiff could walk one block before resting, sit for 15 minutes before having to get up, stand for 15 minutes before needing to move or sit down, and stand and walk for a total of less than two hours in an eight-hour day. (AR 544–45.) She believed Plaintiff would need to take unscheduled 15–minute breaks every 15 minutes of an eight-hour workday and that Plaintiff's legs should be elevated 30 degrees for 75% of an eight-hour sedentary workday. (AR 545–46.) Dr. Olivares stated that Plaintiff needed to use a cane or assistive device for occasional standing and walking; could "never" lift 10 pounds or less; could never twist, stoop, crouch, or climb ladders or stairs; and had "significant" limitations in reaching, handling, and fingering. (*Id.*) When asked to what degree Plaintiff could tolerate work stress, Dr. Olivares indicated that Plaintiff was capable of "low stress jobs." (AR 547.) She stated that Plaintiff would be absent from work more than four days a month as a result of his impairments or treatment. (AR 548.) She stated that "2007" was the earliest date that her description of Plain-

tiff's symptoms and limitations applied. (*Id.*)

On August 17, 2009, an x-ray of Plaintiff's lumbar spine showed "[s]atisfactory post-op appearance." (AR 724.) On August 18, 2009, physician's assistant DeVere noted that the x-rays showed "good positioning of hardware" but that they were "unable to tell if [Plaintiff] had osseous fusion." (AR 887.) DeVere noted that Plaintiff reported that he "feels well and has no pain." (*Id.*) Upon exam, Plaintiff had restricted range of motion of the lumbar spine, his sensation and motor function were grossly intact, and he had no gross motor or neurologic deficit. (*Id.*) DeVere noted that they would follow up with x-rays in three months. (*Id.*)

On October 14, 2009, Dr. Olivares noted that Plaintiff reported that his blood sugar remained high, he had an infection on the side of his abdomen, and he was "still with numbness to hands and feet and unable to work." (AR 861.) Her assessment was "diabetes mellitus without complication" and "cellulitis and abscess of the trunk." (*Id.*)

On November 14, 2009, Plaintiff was admitted to the hospital for acute renal failure. (AR 843–60.) That day, a CT of his head showed no acute intracranial disease. (AR 839.) Plaintiff was noted to have sepsis, possible fluid volume depletion, and possible influenza or viral syndrome, among other things; he was admitted for treatment. (AR 850–51.) The record does not appear to reflect when Plaintiff was discharged.

On November 24, 2009, in a note that appeared to have been initialed by physician's assistant DeVere, Plaintiff was noted to have pain with range of movement and a negative straight-leg raise. (AR 886.) On January 19, 2010, Dr. Olivares completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment. (AR 935–41.) She

stated that she had been treating Plaintiff "as needed/monthly" since May 22, 2009. (AR 935.) She noted that Plaintiff had "localized epilepsy," transient cerebral ischemia, and fibromyalgia, and she estimated Plaintiff's pain to be eight out of 10 and his fatigue to be nine out of 10. (*Id.*) Dr. Olivares believed that Plaintiff could sit for zero to two hours in an eight-hour day, stand or walk for zero to two hours in an eight-hour day, and never lift or carry 10 pounds or more. (AR 936.) Plaintiff had "significant limitations" in doing repetitive reaching, handling, fingering, and lifting, and he needed to use an assistive device for occasional standing or walking. (*Id.*) Dr. Olivares stated that Plaintiff was incapable of tolerating even "low stress" but had no "emotional factors" that contributed to the severity of his symptoms and functional limitations. (AR 937.) She indicated that Plaintiff had "limited vision"; needed to avoid noise, temperature extremes, humidity, dust, and heights; and could not stoop, push, kneel, pull, or bend. (*Id.*) Finally, Dr. Olivares noted that Plaintiff would be absent from work about two or three times a month as a result of his impairments or treatment. (AR 938.)

At the January 20, 2010 hearing before the ALJ, Dr. Ostrow, a board-certified internist, testified that Plaintiff's medically determinable impairments included "status post spinal fracture in 1991" with subsequent fusion surgery, anxiety, morbid obesity, obstructive sleep apnea, possible ischemic strokes, diabetes mellitus, bilateral L5 radiculopathy, and psoriasis. (AR 178.) Dr. Ostrow also noted that Plaintiff had been diagnosed with fibromyalgia, which he believed was "not well documented or substantiated and in light of [Plaintiff's] other underlying medical problems" was probably incorrect. (*Id.*) Dr. Ostrow opined that Plaintiff could lift 20 pounds occasionally and 10 pounds repetitively, stand or walk for two hours in an eight-

hour day, and sit for six hours in an eight-hour day. (AR 179.) Plaintiff was unable to use his upper extremities above shoulder height, could only occasionally turn his head, could use his lower extremities as "guides only," and could not use foot pedals. (AR 179–81.) Dr. Ostrow opined that Plaintiff could occasionally bend, stoop, or climb stairs but could not climb ropes, ladders, or scaffolding or work at unprotected heights. (AR 179.)

On January 22, 2010, Dr. Olivares noted that Plaintiff weighed 290 pounds and had reported that his blood sugar was "running much better since taking medication for diabetes" but that he had gained weight since his weight-loss supplement had been denied; he still complained of "numbness to hands and feet," "all over body pain," and an inability to "sit or stand for a long period of time." (AR 891.) Plaintiff reported that he had been evaluated by a neurosurgeon to "have a device inserted into his back for better pain control instead of regular back surgery." (Id.) Plaintiff also reported that he was "awaiting decision" by Social Security. (Id.) Dr. Olivares's assessment was diabetes mellitus without complication, benign essential hypertension, "myalgia and myositis unspecified," and lumbago. (Id.)

In an Assistive Device Medical Source Statement with an illegible date, Dr. Mesiwala stated that Plaintiff intermittently required a cane for standing and walking, and he recommended that Plaintiff continue using his cane "as needed" with "extended" walking. (AR 934.) Dr. Mesiwala stated that the earliest date Plaintiff had required use of an assistive device for standing and walking was his "surgery date" of September 8, 2008. (Id.)

In his April 2, 2010 decision, the ALJ determined that Plaintiff retained the RFC to perform "sedentary work." [8] (AR 26.) Specifically, he could

lift and carry 20 pounds occasionally and 10 pounds frequently; sit 6 hours in an 8 hour day; stand/walk 2 hours in an 8 hour day; occasionally climb stairs, bend, and stoop but avoid climbing of ropes, ladders, or scaffolds; avoid use of upper extremities above shoulder height; avoid use of foot pedals and use lower extremities as guides only; avoid unprotected heights; and occasionally move his neck.

(Id.) In so finding, the ALJ relied on the opinion of Dr. Ostrow, who, the ALJ noted, was a board-certified internist and had "had an opportunity to review the entire medical records and hear" Plaintiff's testimony. (AR 24–25.) The ALJ also "generally accepted" the opinions of examining physician Maze and consulting physician Kalmar "to the extent they [were] consistent with the opinions of Dr. Ostrow" because they were "not inconsistent with the medical evidence as a whole." (AR 29.)

The ALJ gave "less weight" to Dr. Reddy's opinions because "the issue of disability is reserved to the Commissioner" and because Dr. Reddy's opinions were not "well supported by the entire medical evidence." (AR 28.) The ALJ also gave "less weight" to Dr. Mesiwala's opinions because they were not "entirely consistent" with his treatment notes. (Id.) Finally, the ALJ gave "little weight" to Dr. Olivares's opinions because she had seen

---

**8.** "Sedentary work" involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." Id. Thus, "[j]obs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id.

Plaintiff only a few times when she rendered them and because they were "inherently inconsistent" and unsupported by the medical records. (AR 29.)

## VI. DISCUSSION

Plaintiff alleges that the ALJ erred in failing to properly assess (1) the "relevant medical evidence of record including treating physician opinions" and (2) Plaintiff's subjective complaints and credibility. (J. Stip. at 3–4.)

### A. *The ALJ Properly Evaluated the Medical Evidence*

Plaintiff contends that the ALJ failed to properly consider the opinions of treating physicians Drs. Olivares, Reddy, and Mesiwala. (J. Stip. at 4–10.) Plaintiff further argues that the ALJ erred by failing to consider Plaintiff's "need to use a cane" when assessing his RFC. (J. Stip. at 10–12.) Finally, Plaintiff argues that the ALJ should have found the opinion of examining physician Dr. Maze to be "invalid and of no weight whatsoever" because she rendered her opinion before Plaintiff underwent lumbar spine surgery. (J. Stip. at 12–13.)

■ Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester,* 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician. *Id.*

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. *Smolen v. Chater,* 80 F.3d 1273, 1285 (9th Cir.1996). If a treating physician's opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. 20 C.F.R. §§ 404.1527(c)(3)-(6); 416.927(c)(3)-(6).

■ When a treating doctor's opinion is not contradicted by another doctor's, it may be rejected only for "clear and convincing" reasons. *See Lester,* 81 F.3d at 830. When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting the treating doctor's opinion. *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir.2007). Indeed, the ALJ may discredit treating-doctor opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings. *See Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir. 2004); *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir.2002).

#### 1. *Dr. Olivares's opinion*

■ Contrary to Plaintiff's contentions (J. Stip. at 10), the ALJ provided specific and legitimate reasons for according "little weight" to Dr. Olivares's controverted opinions. The ALJ correctly noted that Dr. Olivares completed the July 2009 Med-

ical Source Statement after seeing Plaintiff only twice—in May and June 2009—and she completed the January 2010 Medical Source Statement after seeing Plaintiff only one additional time—in October 2009. (AR 29, 725–727, 861.) The ALJ was entitled to consider the length of treatment and frequency of examination in assessing the doctor's opinion. 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i); *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir.) (as amended Aug. 9, 2001).

The ALJ also reasonably accorded less weight to Dr. Olivares's opinions because her treatment notes "merely noted [Plaintiff's] past medical history with minimal physical examinations." (AR 29.) Indeed, Dr. Olivares made very few findings during the two or three visits that predated her disability opinions. In May 2009, Dr. Olivares noted only Plaintiff's medical history and complaints of toe fungus and briefly summarized an apparently normal physical exam. (AR 727.) In June 2009, Dr. Olivares completed Plaintiff's disability forms, conducted a urinalysis to see if he had a urinary tract infection, briefly summarized another apparently normal physical exam, and prescribed diabetes medication. (AR 725–26.) Dr. Olivares noted that Plaintiff thought he was having seizures but recorded no observations or clinical findings about them and stated only that he needed authorization for a neurologist. (AR 725.) In October 2009, Dr. Olivares noted that Plaintiff reported high blood sugar, improved urination, a healing infection on the side of his abdomen, and "numbness to hands and feet." (AR 861.) She tested Plaintiff's blood sugar and wound and prescribed additional diabetes medications. (*Id.*) With the exception of Plaintiff's wound, a physical exam appeared to be normal. (*Id.*) Those brief, routine notes fail to support Dr. Olivares's finding that Plaintiff suffered from significant functional limitations and was unable to work. *See Connett v. Barn-*

*hart*, 340 F.3d 871, 875 (9th Cir.2003) (treating doctor's opinion properly rejected when treatment notes "provide no basis for the functional restrictions he opined should be imposed on [claimant]"); *Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 692–93 (9th Cir.2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting treating physician's opinion); *Batson*, 359 F.3d at 1195 ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole ... or by objective medical findings"); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir.2001) (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports).

The ALJ also correctly found that Dr. Olivares's July 2009 and January 2010 opinions were "inherently inconsistent." (AR 29.) For example, in July 2009, Dr. Olivares opined that Plaintiff had emotional factors that contributed to his symptoms and functional limitations. (AR 544.) Six months and a single visit later, however, Dr. Olivares found that Plaintiff had no emotional factors that contributed to his symptoms or functional limitations. (AR 937.) Similarly, in July 2009, Dr. Olivares opined that Plaintiff was capable of "low stress jobs" and would miss more than four days of work per month (AR 547–48); in January 2010, she opined that he was "[i]ncapable of low stress" work but would miss only about two or three days of work per month (AR 937–38). Her notes do not explain or account for these differences. The ALJ was entitled to discount Dr. Olivares's opinions based on those inconsistencies. *See Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) ("inconsistencies and ambiguities" in doctor's opinion were specific and legitimate reasons for rejecting it); *Houghton*

*v. Comm'r of Soc. Sec. Admin.*, No. 11–35623, 493 Fed.Appx. 843, 845 (9th Cir. 2012) (ALJ's finding that doctors' opinions were "internally inconsistent, unsupported by their own treatment records or clinical findings, [and] inconsistent with the record as a whole" constituted specific and legitimate bases for discounting them).

Plaintiff summarily asserts that differences in Dr. Olivares's July 2009 and January 2010 opinions were attributable to the "significant amount of treatment" he underwent during the intervening six months. (J. Stip. at 9–10.) As noted, however, Dr. Olivares saw Plaintiff only once during those six months, to treat only Plaintiff's longstanding diabetes and an abdominal wound. (AR 861.) Other than Dr. Olivares, Plaintiff saw only physician's assistant DeVere during the period, who apparently examined Plaintiff without providing treatment. (AR 886–87.) Plaintiff was also hospitalized for treatment of what appeared to be an unrelated infection or virus. (AR 843–60.) Contrary to Plaintiff's assertion, therefore, the record does not reflect a "significant amount of treatment" during the six months in question or account for the differences in Dr. Olivares's two opinions.

The ALJ also permissibly discounted Dr. Olivares's conclusions because the medical records did not support them. (AR 29.) The ALJ noted that on May 5, 2009, x-rays of Plaintiff's lumbar spine showed "good positioning of the hardware and no evidence of non-union." (AR 28, 755.) At that time, DeVere and Dr. Mesiwala noted that they could not tell whether Plaintiff's lumbar spine was "fully fused"

and that Plaintiff had back and left-leg pain and restricted range of motion of the lumbar spine, but he was nevertheless "ambulating without difficulty" and had a negative straight-leg-raising test, "5/5 strength," and grossly intact sensation and motor function. (AR 755.) As the ALJ also noted (AR 29), by August 2009, Plaintiff reported that he "feels well and has no pain" (AR 887). At that time, Plaintiff's sensation and motor function were grossly intact, he had no gross motor or neurologic deficit, and x-rays of his lumbar spine showed "good positioning of the hardware." (*Id.*) And although Dr. Olivares noted that Plaintiff had fibromyalgia, the ALJ reasonably concluded that that diagnosis was not "well documented" because "no physician indicated number of tender trigger points to confirm the diagnosis."[9] (AR 25.) Dr. Maze also examined Plaintiff and found that despite the residuals of Plaintiff's October 2007 stroke, he was still able to lift 20 pounds occasionally and 10 pounds frequently, stand and walk for two hours in an eight-hour day, and perform fine motor activities. (AR 469–70.) Dr. Ostrow, the testifying medical expert, reviewed Plaintiff's medical records and opined that he retained the RFC adopted by the ALJ. (AR 179–81.) And finally, contrary to Dr. Olivares's finding that Plaintiff needed a cane for even "occasional" standing or walking (AR 546), Plaintiff's neurosurgeon, Dr. Mesiwala, recommended that Plaintiff use a cane only "as needed" for "extended" walking (AR 934), and his other treating physician, Dr. Reddy, did not indicate that Plaintiff needed to use an assistive device at all (*see, e.g.,* AR

---

**9.** Fibromyalgia is a "[r]heumatic syndrome of pain in connective tissues and muscles without muscle weakness, characterized by general body aches, multiple tender areas, fatigue, sleep disturbances, and reduced exercise tolerance; seen most frequently among women 20 to 50 years of age; cause is unknown." Ida G. Dox et al., *Attorney's Illustrated Medi-*

*cal Dictionary* 55 (Supp. 2004). Diagnosis is made based on widespread pain for at least three months and pain on digital palpation present in at least 11 of 18 specific sites on the body. *Id.; see also* SSR 12–2P, 2012 WL 3104869, at *2–3 (listing diagnostic criteria for fibromyalgia).

549). The ALJ was therefore permitted to discount Dr. Olivares's opinion because it was inconsistent with the record as a whole. *See Batson,* 359 F.3d at 1195 (ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings); 20 C.F.R. §§ 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."), 416.927(c)(4) (same).

### 2. *Dr. Reddy's Opinion*

■ Plaintiff argues that the ALJ "failed to cite any significant or legitimate reasons for rejecting" treating physician Reddy's opinions and "committed reversible error" by failing to discuss, or even acknowledge, Dr. Reddy's May 2009 Functional Capacity Questionnaire. (J. Stip. at 4–6.)

In August 2008, Dr. Reddy stated that Plaintiff had a history of stroke, fibromyalgia, "spine disk prolapsed," diabetes, and depression and was unable to work. (AR 500.) In September 2008, Dr. Reddy stated that Plaintiff had "multiple medical problems" and was "permanently disabled." (AR 154.) In October 2008, Dr. Reddy stated that Plaintiff had a history of stroke and suffered from "constant" TIA strokes, fibromyalgia, hypertension, and depression. (AR 502.) Dr. Reddy stated that Plaintiff had a limited ability to sit or stand for long periods of time, lift heavy objects, bend, and twist and was "permanently disabled." (AR 503.) Finally, in May 2009, Dr. Reddy completed a Functional Capacity Questionnaire, stating that Plaintiff could "rarely" lift and carry less than 10 pounds and never more than that; his pain would frequently interfere with the attention and concentration needed to perform even simple work tasks; and he would miss more than four days of work a month because of his impairments or medical treatment. (AR 549.)

The ALJ summarized some of Dr. Reddy's notes and his August, September, and October 2008 disability opinions before concluding that "[t]he opinions of Dr. Reddy are given less weight since the issue of disability is reserved to the Commissioner and his opinions are not well supported by the entire medical evidence." (AR 27–28.) It is true that a treating physician's statement on an issue reserved to the Commissioner, such as the determination of a claimant's ultimate disability, is not binding on the ALJ or entitled to special weight. 20 C.F.R. §§ 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."), 416.927(d)(1) (same); SSR 96–5p, 1996 WL 374183, at *5 (treating-source opinions that a person is disabled or unable to work "can never be entitled to controlling weight or given special significance"); *see also McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir.2011) ("A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity."). Thus, the ALJ was not obligated to accept it.

Moreover, as the ALJ found, the objective medical evidence did not support Dr. Reddy's finding that Plaintiff's functional limitations were so great as to preclude all work. Indeed, the evidence that supported the ALJ's rejection of Dr. Olivares's opinion also supported his rejection of Dr. Reddy's opinions, which were very similar. (*See* AR 544 (Dr. Olivares's finding that Plaintiff's pain interfered with concentration); AR 548 (Dr. Olivares's finding that Plaintiff would miss more than four days of work a month); AR 936 (Dr. Olivares's finding that Plaintiff could never lift 10 pounds); AR 938 (Dr. Olivares's finding that Plaintiff would miss two or three days of work a month).)

As Plaintiff argues (J. Stip. at 6), the ALJ failed to specifically discuss Dr. Reddy's May 2009 Functional Capacity Questionnaire. The ALJ, however, was "not required to discuss every piece of evidence." *See Howard ex rel. Wolff v. Barnhart,* 341 F.3d 1006, 1012 (9th Cir.2003). Instead, whether the ALJ was required to explain why he rejected the limitations suggested by Dr. Reddy depends on whether the opinion constituted "significant probative evidence." *Vincent ex rel. Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir.1984); *accord Howard,* 341 F.3d at 1012; *Houghton,* 493 Fed.Appx. at 844–46 (citation omitted). Here, the limitations that Dr. Reddy listed in the May 2009 questionnaire were not significant or probative. First, much of what Dr. Reddy reported was cumulative of his October 2008 opinion that Plaintiff was depressed; "very limited" in his ability to lift heavy objects, twist, and bend; and "permanently disabled." (AR 502.) Second, as previously mentioned, Dr. Reddy's findings were also cumulative of those in Dr. Olivares's July 2009 and January 2010 opinions, which the ALJ properly discounted as unsupported by the evidence as a whole. (AR 29); *see Magallanes v. Bowen,* 881 F.2d 747, 755 (9th Cir.1989) (ALJ not required to recite "magic words" when rejecting evidence and court may draw "specific and legitimate inferences from the ALJ's opinion"); *Mondragon v. Astrue,* 364 Fed.Appx. 346, 349 (9th Cir.2010) (ALJ not required to discuss doctors' specific statements "when their substance was adequately represented by the evidence the ALJ did discuss").

Moreover, Dr. Reddy's finding that Plaintiff could lift and carry less than 10 pounds "rarely" and "never" lift 10 pounds or more was consistent with the ALJ's conclusion that Plaintiff could perform sedentary work, which requires only "occasional[ ]" lifting and carrying of very lightweight items like files, ledgers, and small tools and never requires lifting more than 10 pounds. *See* 20 C.F.R. §§ 404.1567(a) (sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools"), 416.967(a) (same). Thus, while it may have made a better record for the ALJ to have explicitly addressed Dr. Reddy's May 2009 findings, he was not required to do so. Plaintiff is not entitled to reversal on this ground.

### 3. *Dr. Mesiwala's opinion and Plaintiff's use of a cane*

▮ Plaintiff argues that the ALJ erred by rejecting Dr. Mesiwala's opinion that Plaintiff sometimes needed to use a cane for extended walking and by failing to consider Plaintiff's use of a cane when assessing his RFC. (J. Stip. at 6–8, 10–12.) The ALJ accorded "less weight" to Dr. Mesiwala's opinions because they were "not entirely consistent with his treating notes." (AR 28.) Indeed, x-rays of Plaintiff's lumbar spine in May 2009 showed good positioning of the hardware (AR 755), and x-rays in August 2009 showed satisfactory post-op appearance (AR 724).[10] In May 2009, moreover, Dr. Mesiwala noted that Plaintiff had back and left-leg pain and reduced range of motion of his back but also found that Plaintiff was ambulating "without difficulty" and had "5/5 strength" and grossly intact sensation and motor function. (AR 755.) Those findings were consistent with Dr. Reddy's May 2009 Functional Capacity Questionnaire, on which Dr. Reddy did not check the box indicating that Plaintiff needed to use a

---

**10.** The ALJ mistakenly stated that these x-rays were dated March 9, 2009. (AR 28 (citing agency exhibit 19F); AR 724 (agency exhibit 19F, listing "date of service" as "8/17/2009").)

"prescribed cane or other walking device" or had any walking or standing limitations. (AR 549.) In August 2009, physician's assistant DeVere, who worked with Dr. Mesiwala, noted that Plaintiff "feels well and has no pain" and had grossly intact sensation and motor function and no gross motor or neurologic defect. (AR 887.) Finally, in November 2009, DeVere noted that Plaintiff had pain but a negative straight-leg-raising test. (AR 886.) Those findings indicated that Plaintiff was able to walk without difficulty and had acceptable strength and motor function, in contrast to Dr. Mesiwala's finding that Plaintiff needed a cane to walk. An ALJ may reject a doctor's medical opinions that are inconsistent with the underlying treatment notes. *Connett,* 340 F.3d at 875; *Valentine,* 574 F.3d at 692–93; *Rollins,* 261 F.3d at 856.

In any event, even if the ALJ erred by rejecting Dr. Mesiwala's opinion, that error was harmless. As the ALJ noted (AR 28), the VE testified in response to the ALJ's questioning that Plaintiff could perform sedentary work even with the use of a cane, though a walker, by contrast, would preclude it:

Q: With regard to the hypotheticals posed if the individual needed to use a cane or walker for ambulation would that effect [sic] his ability to do the sedentary work?

A: Yes, Your Honor, I believe it would.

Q: How?

A: ... [O]n occasion the sedentary workers will have to go retrieve materials or ... move about to a different work setting. And if, if

they're required to use a walker it's going to impede their ability to perform at the normal pace. So I believe they would not be able to sustain competitive employment.

Q: Okay, that would be a walker not a cane, is that what you're saying?

A: Yes.

Q: Using two hands?

A: Um-hum.

Q: All right. So that would impede both the past work and the other work that you indicated, is that right?

A: Yes, Your Honor.

(AR 197–98.) Contrary to Plaintiff's argument that the VE "appear[ed]" to state that Plaintiff could not work if he had to use a walker *or* a cane (J. Stip. at 11–12), the VE in fact indicated that it was the use of a walker with "two hands," not a cane, that would be prohibitive (AR 197–98).[11] Thus, Plaintiff's asserted need for a cane would not preclude him from performing the sedentary jobs identified by the VE and the ALJ. Any error in rejecting Dr. Mesiwala's opinion was therefore harmless. *See Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1055 (9th Cir.2006) (nonprejudicial or irrelevant mistakes harmless).

#### 4. *Dr. Maze's opinion*

■ Plaintiff also argues, with no citation to authority, that "[t]he simple fact that Dr. Maze rendered her consultative opinion ... on February 29, 2008 and the Plaintiff ended up undergoing major lum-

11. Indeed, the VE's conclusion is consistent with Social Security policy, particularly because Dr. Mesiwala believed Plaintiff needed a cane only intermittently, for extended walking. *See* SSR 96–9p, 1996 WL 374185, at *7 (stating that individual who uses "hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand," and "if a medically required hand-held assistive device is needed only for prolonged ambulation ... the unskilled sedentary occupational base will not ordinarily be significantly eroded").

bar spine surgery on September 8, 2008 should in and of itself render [her opinions] invalid and of no weight whatsoever." (J. Stip. at 12.) The ALJ, however, was obligated to "consider all medical opinion evidence." *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir.2008); *see also* 20 C.F.R. §§ 404.1527(c) (noting that ALJ "will evaluate every medical opinion" received using "all" of several factors, including examining or treating relationship, supportability, specialization, and consistency with the record as a whole), 416.927(c) (same). Moreover, Dr. Maze's opinion postdated Plaintiff's stroke and his alleged disability onset date of October 5, 2007, and was therefore relevant to determining his disability status during the time period at issue in this case. *Compare Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1165 (9th Cir.2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance" especially when "disability is allegedly caused by a discrete event").

Indeed, Dr. Maze's opinion was supported by independent clinical findings and thus constituted substantial evidence upon which the ALJ could properly rely. *See Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir.2001); *Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir.1995). Dr. Maze performed physical and neurological examinations, noting that Plaintiff had mostly normal motor functioning, reduced grip strength on the right, reduced reflexes on the left, intact sensation, and normal coordination, among other things. (AR 467–70.) She diagnosed "[h]istory of stroke" and opined that Plaintiff was limited to lifting 20 pounds occasionally and 10 pounds frequently and standing or walking for two hours in an eight-hour day. (AR 469–70.) Thus, at least as to Plaintiff's limitations resulting from his October 2007 stroke, the ALJ was entitled to rely on Dr. Maze's opinion rather than the other physicians'.

Moreover, Dr. Maze's assessment may actually have been more sympathetic to Plaintiff than if it had been made at a later date because Plaintiff's back condition appears to have improved after his lumbar-spine surgery. For example, in September 2008, Dr. Mesiwala noted that the surgery would likely result in a 90% improvement in pain and tingling in Plaintiff's legs (AR 678), and in May 2009, Dr. Mesiwala noted that Plaintiff was ambulating without difficulty and had 5/5 strength and grossly intact sensation and motor function (AR 755). In August 2009, moreover, a lumbar-spine x-ray showed satisfactory post-op appearance (AR 724), and DeVere noted that Plaintiff felt well, had no pain or gross motor or neurologic defect, and had grossly intact sensation and motor function (AR 887).

In any event, the ALJ accommodated the possibility that Dr. Maze's opinion may not have encompassed Plaintiff's later limitations by crediting it only to the extent that it was consistent with the opinion of testifying medical expert Dr. Ostrow. (AR 29.) The ALJ found that Dr. Ostrow's opinion was consistent with the medical record, and Plaintiff does not challenge that conclusion or the ALJ's reliance on Dr. Ostrow's opinion. *See Thomas,* 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."); *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir.1999) ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it" (citing *Andrews,* 53 F.3d at 1041)); *see* 20 C.F.R. §§ 404.1527(c)(4) (ALJ will generally give more weight to opinions that are "more consistent ... with the record as a whole"), 416.927(c)(4) (same). Dr. Ostrow, unlike the other doc-

tors, reviewed all of the medical evidence and heard Plaintiff testify before rendering his opinion. *See* 20 C.F.R. §§ 404.1527(c)(3) (in weighing medical opinions, ALJ "will evaluate the degree to which these opinions consider all of the pertinent evidence in [claimant's] claim, including opinions of treating and other examining sources"), 416.927(c)(3) (same). Moreover, the ALJ could credit Dr. Ostrow's opinion because he testified at the hearing and was subject to cross-examination. *See Andrews,* 53 F.3d at 1042 (greater weight may be given to nonexamining doctors who are subject to cross-examination). Any conflict in the properly supported medical-opinion evidence was therefore the sole province of the ALJ to resolve. *See id.* at 1041. Plaintiff is not entitled to reversal on this ground.

B. *The ALJ's Errors in Assessing Plaintiff's Credibility Do Not Warrant Reversal*

 Plaintiff argues that the ALJ failed to provide clear and convincing reasons for discounting his credibility. (J. Stip. at 17–20.) Because the ALJ did provide clear and convincing reasons supporting his evaluation of Plaintiff's testimony and they were supported by substantial evidence in the record, reversal is not warranted on this basis.

 An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight." *See Weetman v. Sullivan,* 877 F.2d 20, 22 (9th Cir.1989); *Nyman v. Heckler,* 779 F.2d 528, 531 (9th Cir.1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Molina v. Astrue,* 674 F.3d 1104, 1112 (9th Cir.2012) (internal quotation marks and citation omitted). In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. *See Lingenfelter,* 504 F.3d at 1035–36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (internal quotation marks omitted). If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." *Smolen,* 80 F.3d at 1282 (emphasis in original). When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion. *See Berry v. Astrue,* 622 F.3d 1228, 1234 (9th Cir.2010). Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony. *Lester,* 81 F.3d at 834. If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." *Thomas,* 278 F.3d at 959.

In an Exertional Daily Activity Questionnaire dated December 17, 2007, Plaintiff stated that he gets tired walking short distances, wakes up with nausea and dizziness, and has headaches; he also claimed that the left side of his head gets "hot with fever." (AR 332.) Plaintiff stated that he tried to vacuum, dust, or do dishes when he could, but he also said that he couldn't "do much anymore" and that when he tried to vacuum, he would lose his balance. (AR 332–33.) He could walk only "a short distance" and stand for 10 minutes. (AR 332, 334.) He could lift a grocery bag once every two weeks and carry laundry 20 feet twice a week. (AR 333.) He said that his doctor had told him not to drive. (*Id.*)

In a Disability Report—Appeal dated May 16, 2008, Plaintiff stated that his

slurred speech affected his communication with others and that he had headaches daily and nausea and vomiting throughout the day, memory and vision loss, dizziness, tremors, urination problems, right-side numbness, swelling on the left side of his head, and fatigue. (AR 345.) He said he could not walk far or sit or stand for "long periods of time" and had been given a cane and a walker by his doctor and a physical therapist. (*Id.*) He indicated that he needed help showering and getting his medications and couldn't cook or clean. (AR 353.)

In a Function Report dated June 2, 2008, Plaintiff wrote that he did not do chores because he was "not able to bend" and would "tire fast" if he tried to dust or vacuum. (AR 377.) He said that he did not do house or yard work because it was "hard to do with cane or walker." (AR 378.) Plaintiff said he did not go outside alone because he had fallen on account of "TIA mini seizures." (*Id.*) Plaintiff wrote that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and use his hands. (AR 380.) He could walk for about 10 minutes before he had to rest for 10 to 15 minutes. (*Id.*) He said that stress made his "head hurt" and that he used a walker and cane, which were prescribed in October 2007. (AR 381.)

At the September 2009 hearing, Plaintiff testified that his low-back condition prevented him from sitting for more than 15 or 20 minutes at a time. (AR 213.) He said that he had suffered a stroke that had affected his memory, peripheral vision, and hearing. (AR 214.) He said that he was five feet, six inches tall and weighed 260 pounds, whereas his average weight had been 316 pounds. (AR 214–15.) Plaintiff

testified that his back pain stayed the same after his surgery and that he used a cane for standing and walking every day, as prescribed by Drs. Mesiwala and Reddy. (AR 216.) He testified that his fibromyalgia caused an "aching pain throughout the whole body" and that he usually took about a two-hour nap each day because of the pain and because his medication made him tired. (AR 217–18.) He said that he had TIAs three to four times a week even when taking his medication, during which he had a "seizure feeling," his body would shake, and he would "black out for a brief moment." (AR 218.) Plaintiff testified that he didn't do any household chores, could walk about a block and stand for only 15–20 minutes, and could carry at most the equivalent of a jug of milk. (AR 219–21.)

Reversal is not warranted based on the ALJ's alleged failure to make proper credibility findings or properly consider Plaintiff's subjective symptoms. As an initial matter, the ALJ's RFC assessment is consistent with much of Plaintiff's testimony. For example, the ALJ accommodated Plaintiff's claim that he could lift only the equivalent of a jug of milk by limiting him to sedentary work, which requires occasionally lifting lightweight objects like files or small tools and never lifting objects that weigh more than 10 pounds. (AR 26.) To some extent, the ALJ also accommodated Plaintiff's complaints of difficulty walking and back pain by limiting him to, among other things, only two hours of walking in an eight-hour day, only occasionally moving his neck, never using his arms above shoulder height, never using foot pedals, never working at unprotected heights, and never climbing. (*Id.*)

The ALJ provided clear and convincing reasons for rejecting Plaintiff's subjective symptom testimony to the extent it was inconsistent with the RFC assessment.[12]

12. Dr. Maze's finding of a "component of non-organic overlay in [Plaintiff's] clinical

(AR 26–30.) The ALJ noted that Plaintiff alleged that his "slurred speech affects communication with others" (AR 30, 345) but that Plaintiff "spoke clearly in both hearings in September 2009 and January 2010" (AR 30). The ALJ also noted that in October 2008, Dr. Mesiwala observed that Plaintiff was "alert with fluent speech." (AR 30, 656.) The ALJ was entitled to rely on his personal observation and conflicts with the medical evidence to discount Plaintiff's testimony. *See Orn,* 495 F.3d at 639 (ALJ's personal observations may be used in overall evaluation of credibility but cannot form "sole basis" for credibility determination); *Thomas,* 278 F.3d at 960 (ALJ properly relied on claimant's "demeanor at the hearing" in rejecting her credibility); *Johnson v. Shalala,* 60 F.3d 1428, 1434 (9th Cir.1995) (holding that "contradictions between claimant's testimony and the relevant medical evidence" provided clear and convincing reasons for ALJ to reject plaintiff's subjective symptom testimony); SSR 96–7p, 1996 WL 374186, at *5 ("[T]he adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements.").

The ALJ also found that Plaintiff's "longitudinal medical history" was "not consistent with his allegation of disability." (AR 27.) Specifically, Plaintiff alleged that he did not go outside alone because of "mini TIAs," but the ALJ correctly noted that "after [Plaintiff's] hospitalization in February 2008," no evidence showed "further hospitalization due to TIAs" or a "sus-

tained series of recent TIA attacks that have caused additional dysfunction." (AR 25, 27, 30.) The evidence shows that Plaintiff suffered from after-effects of his October 2007 stroke, at least for a period of time, but nothing shows that any alleged subsequent TIA "seizures" had similar effects. After February 2008, Drs. Reddy's and Olivares's treatment notes occasionally noted that Plaintiff suffered from TIAs, seizures, questionable seizures, or transient cerebral ischemia, but they never advised Plaintiff to seek emergency treatment or recorded any lasting results of those reported events. (AR 150–51, 502–03, 725, 727.) Drs. Reddy and Olivares recommended only that Plaintiff see a neurologist, which apparently he never did. (AR 158, 725.) Moreover, after Plaintiff's February 2008 hospitalization, two brain CTs were normal (AR 130, 839), and by May 2009, Dr. Mesiwala noted that Plaintiff had normal strength and grossly intact sensation and motor function (AR 755). In August 2009, moreover, physician's assistant DeVere noted that Plaintiff had grossly intact sensation and motor function with no gross motor or neurologic deficit. (AR 887.)

Plaintiff also claimed that he had nausea and vomiting throughout the day, but the ALJ correctly noted that none of Plaintiff's treating physicians had noted those symptoms. (AR 30.) Elsewhere in his opinion, moreover, the ALJ noted that Plaintiff's fibromyalgia diagnosis was not "well documented" because he "was not evaluated by a rheumatologist and no physician indicat-

---

presentation" (AR 469) may be evidence of malingering that would relieve the ALJ of the burden of providing clear and convincing reasons for discounting Plaintiff's credibility. *Lester,* 81 F.3d at 834; *Bagoyan Sulakhyan v. Astrue,* 456 Fed.Appx. 679, 682 (9th Cir.2011) ("When there is affirmative evidence of ma-

lingering, which is present in this case, the ALJ is relieved of the burden of providing specific, clear, and convincing reasons to discount claimant's testimony."). Nevertheless, as discussed herein, the ALJ provided clear and convincing reasons for not crediting Plaintiff's subjective symptom testimony.

ed number of tender points to confirm the diagnosis"; further, Plaintiff "stated that he experienced depression" but "was never treated by a specialist nor was he hospitalized due to psychiatric problems." [13] (AR 25.) The ALJ permissibly relied upon a lack of medical evidence as one factor in his credibility evaluation. *See Carmickle,* 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); *Lingenfelter,* 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence"); *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir.2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); *Kennelly v. Astrue,* 313 Fed.Appx. 977, 979 (9th Cir.2009) (same). Indeed, that reason is particularly persuasive here, because a lack of supporting medical evidence persisted even though the ALJ continued the hearing to allow for the submission of additional medical records. (*See* AR 221–24, 230.)

Some of the ALJ's reasons for discounting Plaintiff's credibility, however, may not be legally sufficient. First, the ALJ found that in the May 2008 disability report, Plaintiff had "complained of weakness and numbness in his right side of the body" but that the record showed "no neurologic deficits in terms of strength and sensation." (AR 30.) But the portion of the record cited by the ALJ, Dr. Mesiwala's October 7, 2008 note, actually stated that Plaintiff had "no *new* neurological deficits, in terms of the lower extremity strength and sensation." (AR 656 (emphasis added).) Dr.

Mesiwala's previous note, in May 2008, stated that Plaintiff had decreased sensation and 4 + /5 strength on the right and 5/5 strength on the left, which he attributed to Plaintiff's October 2007 stroke. (AR 110–11.) Thus, Dr. Mesiwala's subsequent finding of no "new" neurological deficits does not support the ALJ's conclusion that Plaintiff's asserted symptoms conflicted with the medical records. Although Dr. Mesiwala later found that Plaintiff had normal strength and grossly intact sensation and motor function (AR 755), other, earlier records supported Plaintiff's claim of right-side weakness (*see, e.g.,* AR 110, 157, 445, 469, 658).

The ALJ also discounted Plaintiff's credibility because Plaintiff claimed that "he does not perform any of the household chores due to inability to bend" but "also stated he vacuums." (AR 29–30.) In the function report cited by the ALJ, however, Plaintiff stated that he did not do chores but also wrote, on the same page, "I have tried to dust, vacuum but I tire fast." (AR 377.) Plaintiff's statement that he had "tried" to vacuum, apparently unsuccessfully, was not inconsistent with his asserted inability to perform chores.

Finally, the ALJ discounted Plaintiff's credibility because he claimed to use a cane and walker that were prescribed in October 2007 (AR 30, 381), but the record was "devoid of actual prescription of a cane or a walker" and Plaintiff was noted to be ambulating without assistance when he was discharged from the hospital in October 2007 (AR 30, 424). Indeed, it appears that no medical professional advised Plaintiff to use an assistive device until September 2008, when a physical therapist noted that Plaintiff would be us-

---

**13.** The ALJ therefore found that Plaintiff's fibromyalgia and depression were nonsevere.

(AR 25.) Plaintiff does not challenge those determinations.

ing a walker while recovering from back surgery. (AR 731, 803.) Although the ALJ correctly found that no prescription appeared in the record and that Plaintiff was apparently not using a cane in October 2007, as he claimed, Drs. Mesiwala and Olivares both later stated that Plaintiff needed to use an assistive device to walk, at least intermittently (AR 553, 934, 936), and the record reflects that Plaintiff was using assistive devices at his medical appointments (AR 111, 469). Because Plaintiff's use of an assistive device is documented in the record, at least as of late 2008, the fact that it does not contain an actual prescription may not be a clear and convincing reason for discounting Plaintiff's credibility, although Plaintiff was apparently wrong about when he started using one. *Compare Verduzco v. Apfel,* 188 F.3d 1087, 1090 (9th Cir.1999) (ALJ properly discounted credibility when claimant "walked slowly and used a cane at the hearing" even though no doctors indicated he used or needed assistive device and two doctors noted he did not need one).

Although the ALJ's errors are troubling, the Court concludes that they were harmless because the ALJ provided other valid bases for his credibility determination. *See Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1227 (9th Cir.2009); *Carmickle,* 533 F.3d at 1162. The ALJ permissibly discounted Plaintiff's credibility because his complaints of "slurred speech" conflicted with his presentation at the hearing and the medical evidence and because Plaintiff's subjective symptom complaints were not supported by the medical evidence. Because the ALJ's credibility finding is supported by substantial evidence, the Court "may not engage in second-guessing." *Thomas,* 278 F.3d at 959 (citation omitted). Plaintiff is not entitled to reversal on this claim.

## VII. CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[14] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

### JUDGMENT

For the reasons set forth in the accompanying Memorandum and Order, it is hereby ADJUDGED AND DECREED THAT (1) Plaintiff's request for an order remanding the case for further proceedings is DENIED; (2) the Commissioner's request for an order affirming the Commissioner's final decision and dismissing the action is GRANTED; and (3) judgment is hereby entered in the Commissioner's favor.

---

**14.** This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."